Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Our first case this morning is number 1914-51 Hinkle v. Safe-Guard. Mr. Marshall. Yes, sir. Thank you, sir. May I proceed? You may proceed. Thank you. May it please the Court, Jonathan Marshall with the law firm of Bailey and Glasser and I represent Robin Hinkle, a plaintiff's appellant. This action arises from the sale of a debt cancellation insurance product that was made as part of the purchase of a car. The company that sold the defendant's gas insurance product, Safe-Guard, was not licensed to sell insurance. None of the forms it used were approved by the insurance commissioner and therefore is forbidden from collecting a premium on the product. Plaintiff therefore brought claims under Article 2 and Article 6 of the West Virginia Consumer Credit and Protection Act related to the sale of insurance and collection of a premium because alternative forms of relief through insurance code referenced by the court do not provide any other direct mechanism to get a refund of the premium. She also brought insurance-based individual claims on the bad faith denial of her insurance claim. Your Honors, what happened to Ms. Hinkle is not an uncommon fact pattern. It has been the case where lenders, at the point in which a loan is made, insert improper fees. Indeed, it is nearly impossible to leave a dealership, it seems, without a dealer attempting to sell some additional product to you. When lenders, dealers, and other retailers cross the line and collect fees or other amounts of money that should not be collected, they should be held to account. Now, I'm happy to tackle the issues in any order the court desires, but I'd like to try to get to the nub of the three issues as I see them quickly. So, with that in mind, Error 1, I'd like to address Article 2 first. The court dismissed Ms. Hinkle's Article 2 debt collection claims just because she paid the premium. Taking the court's logic further, according to the opinion, had Ms. Hinkle simply not paid, or waited some unspecified period of time to pay after the transaction, she would have had a claim. This standard is unworkable and is not supported by the plain language of the statute, which defines a claim as being any obligation arising out of a transaction. Transaction being a critical term and connoting not only the discharge of a contract, but also, as set forth in a district court's opinion, the act or an instance of conducting business or other dealings, especially the formation, performance, or discharge. Mr. Marshall, this is SDS, if I may. With respect to this particular claim, if I go to the supermarket and purchase a bag of groceries and pay at the point of sale and leave the supermarket, under your theory, would I have a claim against the supermarket as a debt collector? The answer to that question is I do not believe that you would, because here, in order to state a claim, this is only a threshold question, whether there is an actual debt collection in progress. Whether you have a claim or not, you have to actually refer to the substantive provisions of the actual code itself, i.e., there has to have been some sort of unfair, deceptive act or practice. Well, so, but I don't know that you answered my question, so assume that I would later claim that there was an unfair or deceptive practice of some sort. Would I have a claim against the supermarket? Yes. So there's no limiting principle here? It doesn't matter the nature of the transaction? I mean, it seems kind of intuitive that if you pay for something on the spot and the liability is extinguished at that point, that just doesn't sound to me consistent with the conventional view of what a debt collector is. And that's an important point, or important clarifying point. So, this is, the definition of claim is very specific, and so in your fact pattern, yes, arguably there could be a claim if, again, that substantive conduct was met. But again, here, what we're addressing is really just a threshold question of what is a debt collector. Under your fact pattern, I couldn't imagine a situation in which a claim, ultimately a substantive claim, would exist. But here's the point. The point is, I can give you examples, and this is a prime example, where an illegal fee is inserted into the making of a transaction. A person pays for the fee, and they should have a claim under those circumstances in a typical type of credit transaction. This happens. And again, I understand the concern. I do understand the concern. But trying to impose some delay of payment requirement, whatever that might mean, is totally unworkable, or very difficult to make work. Excuse me, Mr. Marshall, but the problem is that once you pay for the, whether it be a policy, a good, a service, whatever, in full at the point of sale, where's the obligation to pay money that results from that? There may be other obligations inherent in that contract that might result in a violation of some kind. But the whole gist of this statute is the obligation to pay money that results from the transaction. And in this scenario, your facts and my facts, there simply is no further obligation to pay money. But I think the key here is the linchpin is the word transaction. And transaction means not only the discharge of a transaction or discharge of a contract, but it's actually its formation as well, too. And so if that obligation arises from, arises out of that transaction, i.e., even the formation, then under the plain language of the statute, you have a claim. And again, I guess to the extent that there is ambiguity with respect to this statute, with respect to this application, the ambiguity should be decided in favor of the consumer. If the consumer is subject to an unfair or deceptive act or practice, they should have a claim. Whereas, under your situation, I mean, if the supermarket were to do something improper, the consumer should have a claim. The supermarket shouldn't be protected just because the transaction arose out of a point-of-sale type of situation. That's the way the Consumer Act works, and it's the way it's been construed, too. And again, it's not to say under your circumstance. I couldn't imagine, and sometimes this is an example of, you know, you can take things to their extreme where a person would ultimately have a claim under those facts. But I can imagine a situation in which somebody goes to a dealership. They purchase a car. As part of the purchase, the transaction gets crammed with improper fees or some sort of improper product, and a person brings a case. And they should be able to bring a case under those circumstances, notwithstanding the fact that they paid for the product or service up front or maybe even a little bit after the fact. And I think also, too, if one looks at what it means to have a deferral of payment, which the court held was not required. I believe the court held it was not required. Well, if it's not a deferral of payment, then what is it? And what it is is a claim that rises out of a transaction. This is Judge Wynn. I'm following up on Judge Diaz's question because I think that is the key to the case here in the interpretation of the statute. And we have here definitions for debt collection and claim. And it seems like it must have been – to be a debt collection, you must have been collecting on a claim at the time. And so we are constrained, notwithstanding the arguments you're making, which may be a good policy argument, by what essentially the statute says and to the extent that we can glean from West Virginia cases how to interpret it. Now, what West Virginia cases do you say support this broader definition of claim that would expand what looks like the definition of debt collection to virtually any seller of a good or product, as Judge Diaz has alluded to? What cases are you relying on in West Virginia that gives us that direction on this broader definition? As the court knows, we cited a series of cases, the Saran decision. And to be perfectly blunt, Your Honor, we don't have a case that directly addresses this point. We have cases in which a transaction arose out of a point of sale. It's quite clear you don't have a case directly on point. It's one we probably wouldn't be here, and I understand that. But the question really is we've got to glean from the West Virginia cases at least what we would think that the Supreme Court of Appeals of West Virginia would do. So it's not explicitly addressed the question, but you do have some cases out there. You pointed to the Dunlap case and to the Caldwell case for support on this. But how do we glean from that that the West Virginia papers this broader definition that would expand it to virtually any seller of a good or product? Yeah, I think the other case we cited was Fleet. And in each of those cases, particularly Fleet and Dan's Car World, where the court actually was addressing construing claims, the court held that the collection activity constituted or was subject to the act. This is not – but to answer your question, those are our authorities. And in each of those instances – Well, if you take those authorities, you've got the two cases there, and they don't go to the question of the point of sale payment. What they seem to suggest is that a claim is a follow-on payment obligation for a prior transaction, which is not what you have here. And so I don't see the support that you can get from those cases for this broader proposition of the definition for claim. And this is often the issue with this Consumer Act. We don't have a law of authority. And the court – I guess the converse is true. I don't have – there aren't any cases that say we can't do this. Obviously, we wouldn't be sitting here if we did. Well, I just want to make it clear that the cases you cite are not really going to – are not very helpful on that point because they are not cases that deal – those are cases that dealt with a follow-on payment obligation for a prior transaction. And it's not the case you have here. So that leaves us empty, as you say, without what – from your perspective of any cases on it. So then we turn it back to the statute, and we seek to determine if there is a plain meaning here that we can glean from the statute. I agree, Your Honor, and that's where I believe that the analysis lies. Mr. Marshall, can I just follow up on that? So earlier, when you were responding to my questions, you said that the reason why we should allow for this expansive reading is because otherwise the consumer would be left without a remedy. But that's not quite correct, right? Because there are other provisions in this statute that provide potential remedies, including Article VI, which prohibits unfair methods of competition and unfair and deceptive trade practices. And you have an argument with respect to that. So it's – you know, the problem is, as Judge Winters pointed out, there's no case that supports – and you've conceded – that supports this really expansive reading of the statute. It is intended to be a remedial statute, but we can't – it also is not intended, I think, to remediate each and every potential problem that a consumer may face. There are other provisions of this statute, and perhaps you want to turn to that and tell us why you think the district court erred with respect to these other claims that you have. I could. It appears I might be out of time, though. I haven't heard the chime. You go ahead and answer the questions. I might have a couple questions myself as Judge King. Okay. You answer D.R.'s question first. Okay. So as I looked at – I wasn't trying to make myself – or make extra work by bringing this claim. The Consumer Act, the general provisions – this is Article I through Article V, which includes Article II, the debt collection provisions – was very concerned with overcharging. Admittedly, I brought in Article VI claim also, too, because I felt that that could be a potential avenue for relief. But in terms of bringing – may I proceed? In terms of bringing the actual claim itself, Article II, it made perfect sense because, again, the statute's concerned with overcharging. But with respect to the other two claims that are at issue here, particularly Article VI, this was an error that occurred. In terms of the plain language of the statute, the legislature had an intention when it prepared and it created this act. Now, some of the tension arises because it's a combination of two different acts. It's a combination of the UCCC and the National Consumer Act. And they had very somewhat differing or competing views on what should be regulated and what shouldn't be regulated. Now, with respect to Article VI, the legislature chose to define service to include insurance. That was an intentional decision, and it chose to define trade or commerce as including insurance. And it chose to prohibit unfair deceptive acts or practices in trade or commerce, bringing insurance within the ambit of Article VI. Now, there is an exclusion for the sale of insurance. But that exclusion is tempered by, except as otherwise provided in this chapter. Now, that's very important, and that intersection is very important. And that's where this tension between the UCCC and the National Consumer Act comes into play. The UDAP provisions and the Article II provisions we're talking about came from the National Consumer Act. And when commenting on the difference between those two acts, the National Consumer Act, and this is rare for West Virginia. We usually don't have legislative history or anything, but we actually have some here because we have the two model acts in our commentary. The National Consumer Act recognized that the Uniform Commercial Code did not include insurance and exempted it out. But there was an intention with the National Consumer Act to put it back in and to regulate it. And that's exactly what happened here. And, again, our provisions come from the National Consumer Act. Mr. Marshall, when you were in the district court, you all sought to certify a question to the Supreme Court of Fields, West Virginia, correct? Yes. And that request for certification was denied? Yes. And was that the issue that you've been discussing here this morning? Yes. Okay. And what's your position on certification now? You haven't made such a motion on appeal. I have not. Your Honor, I'm very concerned about these issues, particularly the Article II issue. I am very concerned about where the court might draw the line. I'm very concerned that if the court draws the line in a different place or a place that would be unworkable, that we may be exempting out certain transactions that are in desperate need of regulation. Which court are you talking about? Are you talking about if the Supreme Court of West Virginia draws the line or we draw the line? All courts. Any court. Every court. There's a big difference. There's a big difference. If we do it, we're just basically making a good estimation of belief as to what West Virginia is doing. If the Supreme Court of Fields, West Virginia, does it, that's just the way it is. So which one of those courts are you talking about drawing a line? I'm concerned about both courts drawing a line, but I did make the request for the West Virginia Supreme Court to draw the line. I'm just trying to understand your answer to Judge King's question. Are you asking for this to be certified, that we certify this to the West Virginia Court of Appeals? Or have you just not abandoned that? To be honest with you, Your Honor, I have demanded it. I asked for it. No, you have abandoned it. You have abandoned certification. I did not. You did not. You raised the issue. You have abandoned certification. Now, we could certify to Esponte, but you have abandoned that effort, correct? Correct. I did not renew it. There you go. All right. You've saved some time. Let's see what Mr. Van Volkenburg has to say about this. Mr. Van Volkenburg, are you there? Yes. Judge King, Judge Wynn. Thank you, Your Honor. Judge King, Judge Wynn, Judge Diaz, may it please the court, this is Jeff Van Volkenburg. I'm here with my co-counsel, Deb Varner, from the law firm of Varner & Van Volkenburg in Clarksburg, West Virginia. We're here on behalf of the Appalachian Safeguard Products International, LLC. The court has honed in directly on the issue that the parties have spent an extensive amount of time briefing, which is whether Safeguard is a debt collector engaged in debt collection. The court's analysis and questioning, obviously, has honed in on the specific issue. And initially, to circle back to the example that was discussed concerning the purchase of groceries that Judge Diaz had questioned counsel about, in that particular instance, there was no action by the grocery store that would bring this type of transaction into what would commonly be referred to and, pursuant to the express language of the statute, into what we would call debt collection. Appellant is cited to multiple cases discussing the West Virginia Consumer Credit Protection Act, as well as the FDCPA. None of those cases, in any way, shape, or form, support the position that Appellant has taken concerning the Article II claims that are before the court. Now, in light of the district court's reconsideration of its initial ruling on the motion to dismiss that was filed, I think all parties can agree that the requirement of some deferred payment is not a necessity for purposes of the Article II claims. However, every single case cited under the West Virginia Consumer Credit Protection Act, as well as the FDCPA, requires something more than a simple point-of-sale transaction. Each case, whether discussing a dishonored check, a failure to pay homeowners association dues, or utility payments, required some additional conduct. And that's what brought it into the gambit of these respective statutes. That simply is not present here. What happened here was a simple one-time payment that was made for purchase of the safeguard gap addendum. There was no additional conduct by Safeguard to try to collect any sum from Ms. Hinkle, the appellant, herein. There was no additional contact from Safeguard until such time as the claim was made approximately five years after this transaction took place. Discussing some of the cases briefly, the vast decision that's been heavily discussed within the briefing of the parties involved in the dishonored check, this was an FDCPA claim, and so that check being dishonored triggered the collection efforts. And that then triggered the potential FDCPA claim. So without that particular conduct, had the check been honored, there would have been no claim under the FDCPA. Fleet versus Weber Springs, which is a decision discussing the West Virginia Consumer Credit Protection Act, was an action against homeowners to enforce liens for HOA assessments. Again, if the parties had undertaken the original agreement, there would have been no action under the West Virginia Consumer Credit Protection Act. Mr. Wilkins, this is Judge Wendt. The statute defines a claim as any obligation to pay money arising out of a transaction. Why wouldn't a typical customer transaction like this one here, which is the exchange of money for a service, result in an obligation to pay money that, quote, arises out of, end quote, the transaction? Your Honor, the district court undertook a detailed assessment, understanding that there were several terms that were undefined within the definitions under 46A to 122, including debt collector, debt collection, and claim. And under that particular circumstance, we have to focus in not only on the term claim, but also the inclusion of the term consumer, which is included within that definition of claim under 46A to 122B. And under the definition of consumer, what is required under these circumstances, a consumer is defined as any natural person obligated or allegedly obligated to pay any debt. And that is the critical consideration here for this particular analysis. Because when we include the term debt within that particular analysis of what is a claim, we get back to an undefined term within the statute. And so Judge Copenhaver did a very good job of walking through the various terms that were undefined, including the term debt, which he defined as having a liability on a claim, a specific sum of money due by agreement or otherwise. And that's from Black's Law Dictionary, 10th edition, and that's on page 17 of his order. And he also cited Osborne v. United States, which found that West Virginia has been consistent that undefined words and terms used in a legislative enactment will be given their common, ordinary, and accepted meaning. So taking that undefined term of debt, utilizing the common definition in Black's Dictionary or under Merriam-Webster, which means something owed an obligation or a state of being under an obligation to pay or repay someone or something in return for something received, a state of owing, taking that analysis, there has to be some further obligation after that initial point-of-sale transaction. And that simply was not present here under the analysis. Mr. Van Valkenburgh, can I ask you to turn your attention to the other issues on the field here? And let's put aside for the moment the question of whether or not insurance is defined or exceeded under the relevant statute. But I wanted to talk about the claim that the plaintiffs had with respect to that they can breach a contract and unfair trade practices regarding the gap insurance coverage. And so the district court in this case found that no reasonable person would credit or expect credit for one's own delinquency to be part of that coverage. And intuitively, you know, that sounds correct to me. But I wonder whether it was proper for the district court to define as a matter of law that no reasonable jury was to conclude otherwise under this West Virginia doctrine of reasonable expectations. As I understand it, that requires showing two things. First, that there be reliable and relevant evidence, in this case, extrinsic to the gap defendant that would cast doubt on whether or not the plaintiff's claim was covered. And then second, that their expectations regarding the defendant's coverage were objectively reasonable. Now, on that first point, you know, this universal underwriters case potentially says that even assuming that the contract is unambiguous, the question is whether or not there's any extrinsic evidence to cast doubt on otherwise expressed terms of the agreement. So why wouldn't the salesperson pitch to her that no matter the circumstances she would be covered, cast that kind of a doubt? Your Honor, thank you for raising that issue, and it is an important one. Now, it's important in this particular instance to drill down, I think, on the specific facts involved in this particular case. The gap addendum involved a $495 purchase price. And it's a two-page document. Universal underwriters dealt with a 200-page insurance policy. In this particular instance, the appellant, Ms. Hankel, confirmed while being deposed under oath that she had read the agreement, that her husband had signed the agreement when they were there, when they were there purchasing this automobile. The key terms were the actual cash value and unpaid net balance. In this particular instance, it is undisputed that following almost immediately the purchase of this automobile, Ms. Hankel and her husband began to miss payments, request deferred payments, incurred late fees. And the appellant's position, and it has been since the initiation of this matter in 2012, was that despite these facts and despite the definition of unpaid net balance, specifically excluding any late payments, deferred payments, or missed payments, that they were entitled to the recovery of the entirety of the amount owed at the time of the automobile accident in excess of the fair market value of the automobile. Had appellant made all payments under her retail sales agreement for the purchase of this automobile, appellant would have actually received approximately $2,000 from her liability insurance carrier. Now, undertaking this analysis, utilizing what is reasonable under the circumstances, the purchase of a $495 GAAP addendum, which was designed to cover any overage over top of the payment that a liability carrier would have provided, undertaking that reasonable assessment, I believe the district court correctly decided that under the circumstances, it was unreasonable for someone to demand that, not to go through the parade of horribles, but under appellant's assessment of this analysis, she could have just not made a single payment under her automobile retail sales installment contract and then gotten an accident and expected safeguard for the $495 to cover the entirety of her automobile overage at that time, which would have been the entirety of the actual purchase price. So when we're talking about this assessment of reasonable expectations, and a dealer says, well, yeah, it'll cover any damage to your car, understanding that there are specific terms in the two-page document that Ms. Ingle read, the district court correctly decided that this simply was not a reasonable expectation under the circumstances, and even a trier of fact would have decided the same thing, and there was no need to get to the trier of fact based on the explicit terms of the agreement, as well as the analysis of the specific facts of this particular matter. So the particular statement that the salesman made, as I recall, was that the GAAP insurance would cover whatever the insurance didn't pay, and understanding what you just said about we're not dealing with a complicated contract, there's some evidence in the record that she may have skimmed, but doesn't that statement suggest perhaps that a reasonable juror could find in her favor, based on that sort of blanket that the insurance would cover whatever the insurance didn't pay? To your point, I mean, I'm not suggesting that she's entitled to judgment as a matter of law, because intuitively, as you point out, it just doesn't seem to make sense, but that doesn't mean, the question is whether or not she's entitled to get in front of a jury. Right, Your Honor, I don't believe that's the case in this particular instance. The West Virginia Supreme Court of Appeals has been very clear that it is not incumbent upon someone who sells an insurance policy to sit there and walk a potential purchaser of a policy through every single provision of an insurance policy. And frankly, from a public policy perspective... But that's different than representing an insurance policy to be something different than what it actually is, which is what is contended here. Well, yes, Your Honor, but under normal circumstances, you wouldn't expect a person to miss payments, incur late fees, and then expect the purchaser or expect the insurance policy in this particular instance to just cover that amount under normal circumstances, assuming a purchaser... Well, in Southern West Virginia, a lot of people miss their car payments, and coal miners go in and out of work all the time, that kind of thing. Actually, they're charging them, like on this loan, 14% on a car loan. Right. Because they don't make their payments. And that's very... The expectation would be they will miss payments. Well, the reasonable expectation may be that they will miss payments, but the reasonable expectation also is that for the purchase of a $495 GAAP addendum that you can't expect someone in that or a company in that particular industry to cover the entirety of that debt. As a business model, that would be completely and entirely untenable, and that's why they specifically include the exclusion. That's why they include the language on the first page near the signature that says that I have read the entirety of this GAAP addendum. Well, any ambiguity is construed against the insurance company, isn't it? Your Honor, respectfully, I don't believe... Isn't that right? That is correct. But in this particular... Did the Domingo County Circuit Court rule that it was ambiguous? Your Honor, Santander had filed a motion arguing... Did the Domingo County Circuit Court rule that it was ambiguous? I believe so, Your Honor, in relation to Santander. It made some rulings, and then they took it to the Supreme Court of West Virginia trying to get it turned around. You all did, and you lost. And so the Domingo County rulings would be the law of the case here. When it came into the federal court and was removed after those rulings, that was the law of the case. And not only that, it's the law of West Virginia. I guess that's why the Domingo Circuit Court ruled that way. Your Honor, the issue in front of the West Virginia Supreme Court of Appeals was whether this product was insurance or not, which was a novel issue and had not been addressed by the Supreme Court at that time. That was what you tried to get prohibition, and it was denied. That is correct, Your Honor. Subsequent to which the... So when it came over to the federal system, that was the law of the case. It's the same case, right? Yes, Your Honor. And did you resist the effort to certify, or did you take a position on that? We did resist the effort to certify. We had, in conjunction with that, filed a motion to dismiss the claims themselves under the Consumer Credit Protection Act. And the court, before we got to the decision on the certification, issued the motion, ruled on the motion to dismiss, which rendered the certification issue moot at that point. Well, the certification issue was denied. The certification request was denied, but it was denied at the same time the judge ruled in your favor. Correct, Your Honor. Right back. Your Honors, I believe my time is about up. Unless the court has any additional questions, I believe I'm concluded with my argument at this point. Judge Wynn, do you have anything else? I do not. Judge Deog? I don't. Thank you very much. Thank you, Mr. Van Volkenburg, very much. We appreciate it. I appreciate the opportunity to appear before you today. Thank you so much. Good to have you here. I'm sorry that it has to be on a telephone setting. Maybe next time we'll have you in Richmond. I will look forward to that, sir. Thank you. Yes, sir. Mr. Marshall? Yes, sir. You saved a few minutes. Go ahead. Thank you. So I want to first address the Article 2 claim again, and particularly I want to take issue with one thing that Mr. Van Volkenburg mentioned, and that was conflating the definition of consumer with claim. The issue in this particular instance is not the definition of consumer. The issue that has been raised is the definition of claim. And claim, which is in Subsection D, debt collection, which is in Subsection C, and debt collector in Subsection D, of course, all refer to one another. The definition of consumer was added later. And so when the court is construing the word claim, the relevant subsections really are B, C, and D. And that was one of the issues, I believe, that came about as a result of the court's formulation. The court inserted the word debt into claim. The word debt is not in the definition of claim. It is simply a transaction. And the use, again, of that word transaction was intentional as provided for in the National Consumer Act. And this is commentary. This is in the Joint Appendix. Transaction is a vital term throughout the Uniform Commercial Code and this Act. It is nowhere defined in the code. This definition ties it to the emphasis this Act placed upon a true agreement by the consumer to avoid allowing a merchant to use technicalities of contract law as a means of avoiding his obligations and responsibilities. This definition makes it clear that there is not, that there need not be an enforceable contract as long as there is an agreement, which is a bargain of the parties, in fact. And so the definition of transaction, again, is very important. And as to the issues as to authority, again, there are no cases that say that this is not a proper construction. The court does have to construe the statute. But in construing the statute, the purpose here is to construe it in such a way as to protect consumers. And so in the example of a retailer engaging in an unfair or deceptive or bad practice in violation of Article 2, they should be held to account under the Act, regardless of whether the consumer paid during the course of the transaction or at some point later. With respect to Article 2, I'm sorry, Article 6, which is the unfair, deceptive acts or practices claims, again, that same framework should be applied with that particular claim as well, too. You have a situation in which the legislature intentionally used the word insurance to define terms. You have an exemption, but then you have an exception to the exemption, which applies. And again, looking at the history, the history explains why that exemption exists as well as why the exception exists. These are intentional words. But to the extent that the court does find ambiguity, it has to be drawn in favor of the consumer. And a very good example of that line-drawing process is the Barr decision, which the defendant cited, the safeguard cited here. And in that particular case, the court was asked to construe the word creditor, as used in one of the remedy sections.  And in that case... Mr. Marshalls, Judge Winn, before you conclude, there's something that's overarching about this case that I would like for you to address, and that goes to the reasonable expectation part of this case that Judge Diaz got into colloquially somewhat. What reasonable person would believe that an insurance policy would take care of your late fees and delinquent payments and address it from the perspective that your opposing counsel gave it? That is, if that is the case, then why would you make any payment? And because if you didn't make any payment, then the policy would cover everything in the event you had an accident or something. That's a fair question. I'll address it this way. There has been a bit of an undercurrent here, not explicit, that perhaps somebody might take advantage of this doctrine in such a way as to essentially gain the system. Let me be clear, at least in terms of what we're talking about here. These are late fees and delinquent payments we're talking about, right? So what happened was... I'm just trying to get a clarification on that. You're not really talking about the value of the policy of the property that wasn't paid by the insurance company just by itself. What you are talking about is essentially additional obligations that came about because of the failure to pay in a timely manner and delinquent payments here, the fees and things added up. Which would arise if you didn't pay anything. Is that what we're talking about is what I'm asking? What happened, yes, Your Honor. What happened was clients, just like Judge King mentioned, fell behind. I got that part. I'm just trying to understand, even if you do, how do you buy an insurance policy to say if I don't pay, you'll pay for me if the car is in an accident? So let me address, let me just go one step further and say client worked with the lender to try to resolve the delinquencies and worked, the car was never repossessed. She fought to catch up and were able to work out an arrangement where there were some payments placed at the back end of the loan. So from her perspective, she is taking care of her obligations, albeit there are financial difficulties here. And really, really what makes this different is that, and this doesn't happen in the normal course of when you buy an insurance policy. You actually have a salesperson there. That's common. But you have a salesperson who is selling an unlicensed product and making representations. And what's very unique here is that you do not have the salesperson testify, I didn't say any of those things. Didn't say what? Didn't say, didn't say I'm going to pay if you don't make your payments and you get late fee messages to put fees in delinquent payments? Oh, didn't, did not contradict this notion of, well, look, there are certain, may I continue? Yes, go ahead. Okay, did not contradict the notion of, look, if you're in an accident, if there's amounts left over, we're going to step in and pay back. And again, and from her perspective, from her perspective, this is not a situation where these are just late fees, or this is just a complete failure to pay. She worked, fought with the lender to try to catch up. And so under those circumstances, yeah, I think it was reasonable for her to say, yeah, this is going to cover me, whatever the circumstances. And again, this particular analysis is very fact specific, right? I mean, it's hard to draw generalized rules across the board, but with respect to this, this particular set of facts, where you have an uncontradicted testimony, why wouldn't she rely on the person who's selling it to her? And very much likely, it's extremely possible this person had no idea what he was selling. There's no evidence in the record that he was trained. And I would also point out that this was a car purchase. Obviously, Ms. Finkel was sitting there signing a bunch of documents. And if you look at this thing, I've looked at it many times. And this is all I do is practice consumer law. And I find it hard to understand. And it's small, very small, tight print. I mean, again, why wouldn't she rely on the statements made by the sales representative? Mr. Marshall? Yes. We appreciate it. Thank you. Thank you very much. Your case will be submitted. And the court will take a break. And that's what we have. Madam Clerk? Yes, sir. All right. That concludes the case. We'll take a break.
judges: Robert B. King, James A. Wynn Jr., Albert Diaz